# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### 1:14-cr-00295 (PGG)

---

### UNITED STATES OF AMERICA

-against-

### LAN LU JIANG "JENNIFER",

Defendant.

---

## SENTENCING MEMORANDUM ON
## BEHALF OF LAN LU JIANG "JENNIFER"

E.C.F. Version August 22, 2014

ALEX B. SPIRO ESQ.
BRAFMAN & ASSOCIATES, P.C.
*Attorney for Defendant*
*Lan Lu Jiang "Jennifer"*
767 Third Avenue - 26th Floor
New York, New York 10017
Tel: (212) 750-7800
Fax: (212) 750-3906

## **Table of Contents**

PRELIMINARY STATEMENT ...................................................................................2

I.    INTRODUCTION ..............................................................................................2

II.   INDIVIDUALIZED ASSESSMENT OF JENNIFER ......................................3

     A.    The Nature and Circumstances of the Offense Conduct ..........................4

     B.    The WIC Program.....................................................................................4

III.  FACTORS THAT DISTINGUISH JENNIFER .................................................5

     A.    Late Arrival and Peripheral Role ............................................................5

     B.    Jennifer's Actual Profits of Theft Amount to Only $34,127 per year and Jennifer Has Already Attempted to Begin Paying Restitution .............................7

     C.    Other Individuals Arrested in the Same Investigation have Received Lenient Sentences in State Court ..........................................................7

     D.    Summary ..................................................................................................10

IV.  THE HISTORY AND CHARACTERISTICS OF JENNIFER ........................11

     1.    Jennifer is a Vital Caretaker and is Deeply Committed to Supporting Her Family ..................................................................11

     2.    Jennifer's Kindness and Generosity Extends to the Community .............................................................................16

     3.    Jennifer Accepts Full Responsibility and is Profoundly Remorseful for Her Criminal Conduct .......................................18

V.   ANALYSIS .....................................................................................................20

     A.    The Law Permits a Below Guidelines Sentence.....................................20

     1.    Guidelines Range..............................................................................20

2.    The Court's Discretion to Vary From Advisory Guidelines ........................ …21

3.    The Factors Set Forth in 18 U. S. C. § 3553 as Applied in this
      Case Urge a Sentence of Probation and Community Service ........................... 24

VI.    CONCLUSION ..................................................................................................... 26

## PRELIMINARY STATEMENT

Defendant Lian Jang Lu ("Jennifer"), through her counsel, respectfully submits this Sentencing Memorandum to assist the Court in determining an appropriate sentence following her guilty plea to conspiracy to commit theft of public funds, in violation of 18 U.S.C. § 371.

## I.   INTRODUCTION

As discussed below, Jennifer understands the seriousness of the offense that she has committed.  However, in this case, her conduct, though serious, does not equate with the prison term contemplated by the United States Sentencing Guidelines.  We submit that a sentence well below the applicable Guidelines range with no jail component is appropriate.  We believe the Court will hopefully arrive at this conclusion after taking into account the fact that the criminal conduct in the Women, Infants and Children ("WIC") program pre-existed Jennifer's ownership of the store, that Jennifer's personal financial gain was relatively minor, and that the nature of the conspiracy, when considering Jennifer's role and viewed with the backdrop of certain cultural and language barriers, suggests that while Jennifer knew what she was doing was wrong, she did not fully understand that her conduct violated the criminal law.

Perhaps, most importantly, none of the other defendants arrested during this investigation have been sentenced to a period of incarceration. In addition, several other factors discussed more fully below distinguish Jennifer from other defendants.  It is our hope that, after reading our Sentencing Memorandum, this Court will be persuaded to sentence Jennifer to probation,

with a condition that she performs 1000 hours of community service, under the supervision of the Probation Department, at Jennifer's Church, a not-for-profit.[1]

   To be certain, Jennifer's application for a non-custodial sentence is not an appeal for sympathy, but rather to reason and understanding.  We are seeking a sentence that balances the crime she has regrettably committed with the extraordinary good which Jennifer has done as a businesswoman, as a community member, and as a family member.  Further, we ask Your Honor to consider the fact that Jennifer quickly surrendered to the authorities. Thereafter, prior to indictment she completely accepted responsibility, once she fully understood the negative impact of her conduct.

   For these reasons and others set forth below, we suggest that incarceration is not the only meaningful penalty available, and that an alternative to incarceration can also constitute a punitive sentence that, in the appropriate case, serves all of the goals of sentencing.  *See Gall v. United States*, 552 U.S. 38, 49-50, 128 S. Ct. 586, 595-96 (2007).[2]

## II. <u>INDIVIDUALIZED ASSESSMENT OF JENNIFER</u>

   Over a decade has passed since the Supreme Court confirmed that under *United States v. Booker*, 543 U.S. 220, 244 (2005), the Sentencing guidelines are advisory. *See Also United States v. Peugh*, ---U.S.---, 133 S. Ct. 2072, 2080 (June 10, 2013).  *Booker* and subsequent decisions have resulted in a system that only "requires a court to give respectful *consideration* to the Guidelines," but it "*permits the court to tailor the sentence in light of other statutory concerns* as well." *Id.* at 2072, (citing *Kimbrough v. United States,* 552 U.S. 85, 1010 (2007) (emphasis added)).

---

[1] As reflected in Exhibit 1, Jennifer has been a volunteer at this organization for many years and is welcome to continue on a full-time basis.
[2] The legal basis for a non-custodial sentence in this case is discussed in depth, *supra* at section III.

In determining the appropriate sentence for a defendant, a sentencing court must "make an *individualized* assessment based on the facts presented," which includes "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *Gall v. United States*, 552 U.S. 38, 50 & n.6, 128 S. Ct. 586, 596 n.6, 597 (2007) (emphasis added); *see* 18 U.S.C. § 3553. In this case, both the circumstances of the offense and the history and characteristics of this defendant support a non-custodial sentence.

## A. The Nature and Circumstances of the Offense Conduct

Following *Gall's* directive to consider the nature and circumstances of the offense, we submit that Jennifer is one of the least, if not the least, culpable defendants in this matter.

Due to Jennifer's having served actively as cashier along with her name being used on documents filed by Lucky Star, the government declined to classify her role as "minor" and agree to the corresponding downward adjustment in Jennifer's guidelines. However, we maintain that her actual conduct in furtherance of the conspiracy was so limited that she should be considered one of the least, if not the least, culpable defendants in this case. Consequentially, the "nature and circumstances" of the offense committed by Jennifer suggest a non-custodial sentence.

## B. The WIC Program

The Supplemental Nutrition Assistance Program ("SNAP") provides a system that gives participants financial assistance to buy necessary food items from authorized stores. The

Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC"), a program related to SNAP, provides food and nutrition education to at-risk pregnant, postpartum and breast-feeding women, as well as to infants and young children from low-income families. *See* 42 U.S.C. § 1786(a).

If a store violates any of the rules and regulations of the WIC program, an authorized state agency may issue a fine or in an extreme circumstance, even disqualify the store from further WIC participation. *See* 7 U.S.C. § 2021(a); 7 C.F.R. § 278.6(a). If disqualifying the store from WIC would impose a hardship on households participating in the program, the agency may impose a civil monetary penalty ("CMP") instead of disqualification.

The WIC New York State ("NYS") requirements and penalties were listed on the NYS government website are attached as Exhibit 2. The 2011 September bulletin, in place at the time Jennifer acquired Lucky Star, indicates a myriad of potential ramifications from improper WIC disbursements, but, notably, does not list criminal sanctions as a possible penalty. Moreover, a review of case filings indicates that WIC violations are typically not prosecuted criminally.

To be sure, there is no question but that Jennifer is criminally responsible and has admitted her guilt in the instant offense. But with the utmost respect for the Court, there is also a strong argument that the felony conviction, financial penalties, and probationary sentence serve as more than a sufficient penalty to serve all of the ends of justice.

## III. FACTORS THAT DISTINGUISH JENNIFER

**A. Late Arrival and Peripheral Role**

In 2009, Aniy Li, a co-defendant in the instant matter, opened a convenience store named New Hing Yung Grocery, at the location that later became Lucky Star, and applied for and received a WIC License. While much of the WIC business at New Hing Yung serviced the needs of the many families in the neighborhood, the business also engaged in illegal WIC business. It was several years later, in 2012, that Jennifer purchased and changed the name of the store to Lucky Star and obtained a new WIC License. At that time, Jennifer did not change the operation of the WIC business at the location, but also did not take the necessary steps to rectify the problem.

Thus, as the Government would readily concede, the WIC conspiracy pre-dated Jennifer's involvement. Nor is there any evidence that Jennifer had been involved in any other similar scheme in her otherwise unblemished life. It thus stands to reason that Jennifer inherited a pre-existing, albeit illegal, state of affairs and had absolutely nothing to do with the design or initiation of the conspiracy. While Jennifer's late arrival certainly does not leave her blameless, the Court should consider the fact that Jennifer inherited this conspiracy from her co-owners who are also her family members.

Despite Jennifer's lapse in judgment, Jennifer only deposited a total of $28,000 of WIC checks. PSR ¶¶ 10. Jennifer's actual role in the store was essentially that of a cashier. As such, her role was peripheral to the overall conspiracy.

Finally, while Jennifer unquestionably understood her conduct was *wrong*, she did not fully understand the gravity and consequences of her actions. Tellingly, as soon as Jennifer's conduct was fully explained to her, and she understood the negative impact her conduct had on the United States (US) Government and its funded program, Jennifer turned herself in and accepted responsibility without hesitation.

**B. Jennifer's Actual Profits of Theft Amount to Only $34,127 per year and Jennifer has Already Attempted to Begin Paying Restitution**

As the annexed forensic accountant memorandum illustrates, Jennifer's actual profits total only $34,127 per year. In addition, Jennifer, as part of her plea agreement, agreed to pay a total of $4,243,836 to the US Government. At sentencing, Jennifer will have set aside $25,000 of her obligation prior to Your Honor ordering her to do so.

Jennifer could have waited for the Court to calculate a monthly payment toward a restitution obligation based on her ability to pay and then let the collection of those funds drag on for years. Instead, she asked family, friends, and colleagues to help raise the funds now to make amends for her crime and to meaningfully demonstrate her acceptance of responsibility.

This sincere reflection of Jennifer's remorse also serves to inform the Court that Jennifer's conduct is a complete aberration from an otherwise law abiding life as the source of her early payment is not an endless pot of undiscovered criminal proceeds. Rather, it is composed of the meager savings she has managed to put together over the years, coupled with the donations of others who want to help Jennifer in gratitude for the endless help and support she has given to others over the years. Upon information and belief, no other defendant in this case has agreed to make any substantial restitution prior to sentence being imposed.

**C. Other Individuals Arrested in the Same Investigation have Received Lenient Sentences in State Court**

As the chart below demonstrates, individuals arrested as part of the same investigation – with the same principal agent, during the same time period, and consisting of approximately the same amount of WIC fraud per month – did not receive sentences of incarceration.

| DEFENDANT | JURISDICTION | DISPOSITIONS | AMOUNT ALLEGED |
|---|---|---|---|
| Lucky Star Grocery, Inc. | Federal | N/A | $4,243,836 Total $132,620 per month |
| Lucky Market, Inc. | State | Xing Lu pled guilty to PL 155.25, petit larceny. (Conditional discharge). Tian Zhuang Lu, and Ron Lu plead guilty to PL 170.10, forgery, 155.35, grand larceny, 175.10 falsifying business records, among other violations. (Probation). | $1,100,000 Total $91,666 per month |
| New Hing Wong Ginseng, Inc. | State | Yi Ting Liu, De Yun Zheng, and Yong Zhou pled guilty to PL 170.10, forgery, 155.35, grand larceny, and 175.10, falsifying business records among other violations. (Probation). | $321,000 Total $26,750 per month |
| H&I Grocery, Inc. | State | Ho Chan, Xiu Lin, Jie Chen, and Hao Chen pled guilty to PL 170.10, forgery, 155.35, grand larceny, and 175.10, falsifying business records among other violations. (Probation). | $275,000 Total $22,916 per month |
| Yong Feng Market, Inc. | State | Ho Chan, Xiu Lin, Jie Chen, and Hao Chen pled guilty to PL 170.10, forgery, 155.35, grand larceny, and 175.10, falsifying business records among other violations. | Unavailable |

| DEFENDANT | JURISDICTION | DISPOSITIONS | AMOUNT ALLEGED |
|---|---|---|---|
| | | (Probation). | |
| Hong Sheng Food, Inc. | State | Ron Lu pled guilty to PL 155.25, petit larceny. (Conditional discharge). Xin Zhen Lu and Qui Bin Lu pled guilty to PL 170.10, forgery, 155.35, grand larceny, and 175.10, falsifying business records among other violations. (Probation). | $1,700,000 Total $242,857 per month |
| Lucky Star Mini Market | State | Xing Lu pled guilty to PL 155.25, petit larceny. (Conditional discharge). Tian Zhuang, Ron Lu PL 170.10, forgery, 155.35, grand larceny, and 175.10, falsifying business records among other violations. (Probation) | $2,196,000 Total $183,000 per month |
| Xing Young Xing, Inc. | State | Ri Zhan Zeng pled guilty to PL 170.10, forgery, 155.35, grand larceny, and 175.10, falsifying business records among other violations. (Probation). | $1,000,000 Total $83,333 per month |
| 6926 Family Mart, Inc. | State | Ho Chan, Xiu Lin, Jie Chen, Hao Chen pled guilty to PL 170.10, forgery, 155.35, grand larceny, and 175.10, falsifying business records among other violations. (Probation). | $1,704,000 Total $142,000 per month |

| DEFENDANT | JURISDICTION | DISPOSITIONS | AMOUNT ALLEGED |
|---|---|---|---|
| Double Crystal Grocery, Inc. | State | Ce Yang Zeng, pled guilty to PL 155.25, petit larceny, conditional discharge, PL 170.10, forgery, 155.35, grand larceny, 175.10 falsifying business records, among other violations. (Probation). | $1,812,000 Total $151,000 per month |
| Xing Shun Grocery, Inc. | State | Yi Ting Liu, De Yun Zheng, and Young Zhou pled guilty to PL 170.10, forgery, 155.35, grand larceny, and 175.10, falsifying business records among other violations. (Probation). | $3,261,000 Total $268,000 per month |

## D. Summary

We submit that the factors discussed above separate Jennifer from other criminal defendants arguably deserving of a harsher sentence. Further, we submit that our proposed alternative to incarceration -- probation, community service and restitution -- will serve all of the traditional sentencing goals: punishment, deterrence, restitution, and rehabilitation, while imposing a meaningful penalty. Jennifer will be under the invasive supervision of a probation officer; she will be deprived of the freedom to use her time as she chooses because she must use her time to complete her community service. Moreover, her very public shame in the Chinese and religious community will deter others from engaging in similar frauds and her private remorse and loss of her business eliminates any likelihood of recurrence of any criminal activity.

Accordingly, our proposed alternative to incarceration constitutes a punitive sentence that is "sufficient but not greater than necessary" to serve the purposes of sentencing and we urge this Court to accept our proposal and not put Jennifer in jail.

## IV. THE HISTORY AND CHARACTERISTICS OF JENNIFER

In making an "individualized assessment" at sentencing, *United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008), the sentencing court is tasked with seeing each defendant in his or her unique human complexity and, in light of a defendant's particular life story, determining the appropriate sentence for the crime a defendant has committed. As this Sentencing Memorandum and the letters submitted in support of Jennifer demonstrate, she is much more than the sum of her criminal conduct. Rather, she is a person who has lived a remarkable life, dedicated to her husband, disabled parent, and two children, serving as a role model to and philanthropic member of her community, and working as a storekeeper who would never turn away people in need. Jennifer is also a person who has taken responsibility for her actions and committed herself to giving back to her city.

### 1.    Jennifer is a Vital Caretaker and is Deeply Committed to Supporting Her Family

As the supporting letters demonstrate, family is the center of Jennifer's life. Her ailing husband, mother and mother-in-law, along with her two adoring children, are what make Jennifer strive to be the best person she can be every day.

Jennifer is the principal caregiver to her husband, mother, mother-in-law, as well as her children, many of whom would be helpless without her. Jennifer's husband, Danny, describes his wife's dedication to their family:

> Since we married in 1987, she has always been our family's

material and spiritual support…Since I suffered from hepatitis and diabetes unfortunately in 1992, I've rarely worked, and [Jennifer] has taken the major task of raising a family. During the period when my two kids studied in college, [Jennifer] even did three jobs. Every day, she worked from dawn to night and lived frugally just to give our kids a good learning condition, hoping they would make progress and contribute to society when they grow up.

(Ex. 3, Letter of Danny Lu, at 1).

Furthermore, Danny asserts how vital Jennifer's assistance is to her diabetic mother and

elderly mother-in law:

[Jennifer] is also a filial daughter. Since my father-in-law died, [Jennifer's] mother has lived with us for a long time. As she has been affected by the prolonged diabetes and unable to move freely, she has to be looked after in her daily life. Moreover, [Jennifer] often went to visit my elderly mother in Chinatown. I can't imagine how to arrange our life when [Jennifer] is not here with us.

(Letter of Danny Lu, at 1).

Dr. Yi Ngai, who treats Jennifer's mother, Mrs. Dong, further attests to the necessity of

Jennifer's care to her mother. She writes:

Mrs. Dong Limei is under my medical care. She lives with her daughter, and is suffering from uncontrolled diabetes and dementia. Mrs. Dong needs daily insulin injection, which is administered by her daughter.

(Ex. 4, Letter of Dr. Yi Ngai)

Jennifer's mother-in-law, Rui Ying Shi Lu, an 80-year-old woman with poor health and

physical condition, notes how Jennifer "cares about [her] health a lot, and often inquires after

[her] health." (Ex. 5, Letter of Rui Ying Shi Lu, at 1).  Jennifer's mother-in-law specifically

notes how Jennifer "drove to Chinatown to visit [her] frequently and brought many daily

necessities and food such as fish, meat, vegetables and [] others." (Letter of Rui Ying Shi Lu, at

1).  In asking for leniency from this Court, Jennifer's mother-in-law notes how she "need[s

Jennifer] to take care of [her] in [her] daily life very much." (Letter of Rui Ying Shi Lu, at 1).

Jennifer's cousin by marriage, Xu Long Lu, affirms the necessity of Jennifer's presence

and support of the family:

> She is the primary caregivers for her husband and kids. In normal
> times, she devotes all her attention to educate her kids to be useful
> persons. And she has dealt with all the affairs, big and small, in
> and out. The family needs her very much…There are two older
> widows in her family. One is her mother-in-law, the other is her
> mother. They are valetudinarians at an advanced age. Their daily
> lives are in sore need of [Jennifer's] attentive care.

(Ex. 6, Letter of Xu Long Lu, at 1).

Jennifer's children illustrate their mother's commitment to the family and stress the

continued necessity of her presence at home.  Her son, Michael, notes how his mother is

> a very hardworking and caring woman…She made sure that I
> would succeed in school and get a degree. She always pushed me
> to work harder so I can have a good future. Without my mom, I
> will not be able to get through school or find a job. She is my
> motivation to succeed. She also takes care of all of the house
> chores at home since my dad is a diabetic and is very sick…She
> sacrificed her time by working in order for her to provide my sister
> and I a better future…My mom helped my family out the
> most…My mom does so much for her family and will continue to
> do her best in order for us to become better and successful. She is a
> loving mother and the most selfless person that I know of…Please
> let my mom stay home with us, she is the most important person in
> our family and is our leader.

(Ex.7, Letter of Michael Lu, at 1-2).

Jennifer's daughter, Scarlett, describes how the family depends on her mother:

All my mom ever wanted to is to provide our family a home to live in, food to eat, and for her children to have a good future. Because of my father's long-term illness of diabetes and hepatitis B, he only works a few hours per week. Father was in bed most of the time due to his illness, his illness cannot be fully healed, father has to learn to cope with it. My father went through surgery too. My father is also very timid, not good at working with others, and he cannot do anything for himself. He is so lost without my mom. My dad depends on my mom for everything; he can barely survive without her…My grandma is also ill, the doctor tells us if she does not take care of her health she will lose her ability to walk. Besides working she takes care of all the house chores, brings my grandma and dad to doctors for frequent checkups. Mother also cooked meals for the whole family every morning to make sure we are fed. Year after year, she just has one goal that is to support me and my brother to have a good education and ultimately to have a good life…All of life burdens are on mother's shoulders…We enjoy every single day of our lives together, especially, with father and grandma's deteriorating health, mother's presence is very important to our family. Please let her stay home with us, she is our pillars of spirit and life.

(Ex. 8, Letter of Scarlett Lu, at 1).

In addition to her role as caretaker, Jennifer is also very supportive of her family and is happy to aid others in their times of need. Zeng Gui Lu, Jennifer's brother-in-law, emphasizes the important role Jennifer plays in aiding the family:

In our clan, [Jennifer] is an obedient daughter-in-law and a good mother to our clan. She bears hardships and stands hard work; meanwhile, she is glad to help others. In our clan, everyone has got her favor and help. When my families immigrated to the US, we were in an unfamiliar environment. We couldn't speak English, so it was very difficult for us to get a job. Under the circumstances, [Jennifer], my sister-in-law, helped me to get a job in a restaurant with pleasure. In my memory, one year, my mother fell ill suddenly, and the doctor diagnosed that my mother suffered a stroke. [Jennifer] was also in Chinatown when she heard the news. She immediately went to the hospital to take care of my mother day and night, and was never afraid of tiredness, dirty and hardship. She helps others with pleasure.

(Ex. 9, Letter of Zeng Gui Lu, at 1).

Zeng Gui Li also recalls a poignant story about how Jennifer helped him and his children

when his wife died:

> In December 1991, the most memorable thing in my life happened.
> My ex-wife passed away, leaving two young kids. It seemed that
> the sky had fallen. At that time, the kids needed mother love the
> most. But she left me and our kids. I was heart-broken. In the most
> painful and helpless days, [Jennifer] comforted me quietly. She
> helped my kids in daily life, took my kids to do outdoor activities
> frequently, meanwhile enlightened my kids. She cared about my
> family meticulously, which shall never be forgotten.

(Letter of Zeng Gui Lu, at 1-2).

Jennifer's sister, Teresa, credits Jennifer with helping and supporting her transition and

success in America:  "As soon as [Jennifer] settled down in the U.S., she brought us here. She

helped our family get out of poverty, and hoped to help me to be able to pursue political &

religious freedom...I treasure every opportunity I have, knowing this is from my sister's

sacrifice." (Ex. 10, Letter of Teresa Jiang, at 1).

In a similar vein, Jennifer's cousin, stresses Jennifer's kindness and good-heart:

> My cousin is a considerate and good natured person. Since the day
> I set foot in the US, she has taken care of me as attentive as a
> mother to her toddler. With her gradual support and assistance,
> soon I could adapt to American lifestyle independently. Besides
> me, she also treats all others who ask her for help generously with
> materials and money. Her exemplary conduct and nobility of
> character win universal praise.

 (Ex. 11, Letter of Jennifer's cousin, at 1; see also Ex. 12, Letter of Jian Ping Zheng, at 1

(Jennifer's sister-in-law:  noting how Jennifer is the first person she would turn to if she was in

trouble: "It is hard . . . to count how many times [Jennifer] helped me out.")).

As evidenced by these letters, Jennifer has had a tremendously positive effect on her

15

family and friends.  Jennifer's husband, Danny, describes it best:  "Our family needs her and the friends and relatives in our community also need [Jennifer's] warmth and care." (Letter of Danny Lu, at 2).

### 2.  Jennifer's Kindness and Generosity Extends to the Community

Jennifer's willingness to help others extends far beyond her family. Her kindness and generosity is noticeable throughout the entire community. Jennifer's benevolence comes without asking for anything in return – she simply takes pleasure in helping others. Jennifer's daughter, Scarlett Lu, affirms this in her letter:

> My mother is a woman with a great heart. She is always willing to help her family and friends. When her relatives or friend first come to America, mother will house them and show them where they can go to school and how to work in a restaurant. Mother never asked them for anything in return, she was always happy to lend a helping hand whenever she can. My mother taught me to be kind to others, to never be selfish. My mom taught me how I should volunteer and give back to the community as much as I can.

(Ex. 8, Letter of Scarlett Lu, at 1; see also Ex. 3, Letter of Danny Lu, at 1 ("In our community, [Jennifer] also enjoys a very good reputation. She is ready to help people and takes pleasure in helping people. When others have difficulties, big or small, she has been totally devoted to offering helps, but never asked for anything in return.")).

Jian Shun Lu, Jennifer's friend, emphasizes how Jennifer dedicates her time and money to community service:

> [Jennifer] is ready to help others and often helps new migrants…[Jennifer] participates in community activities too. Now she is the woman's director of the Fu Qi Association Inc., donating money and exerting herself to serve the community! She has made significant contributions in helping new migrants integrate into the mainstream society of the US!

(Ex. 13, Letter of Jian Shun Lu, at 1; see also Ex. 14, Letter from Chairman of the Fu Qi

Association Inc., at 1 ("[Jennifer] is an excellent staff member in American Fu Qi Association

Inc. She has always been warmheartedly assisting the daily routine of Fu Qi Association Inc.,

enthusiastically helping to exclude fellow townsmen's difficulties and anxieties, and positively

taking part in every volunteer activity of the community with money and effort, holding the post

of main backbone Fu Qui Association Inc.")).

Jennifer's cousin, Alex Sheng Haung, describes how Jennifer took the time to help him

when he started working a new job:

> [Jennifer] is a kind-hearted, warm and helpful person. At the end
> of 2009, I got a chance to work in Lee Kum Kee USA Inc. I was
> unfamiliar with the job responsibilities and specifications;
> therefore, I consulted [Jennifer] as she had worked in the related
> field for years. Her introduction on the marketing industry and
> position significantly helped me join in this company. Hereafter,
> whenever I am in trouble, [Jennifer] is the first person I think of
> and call for help.

(Ex. 15, Alex Sheng Huang, at 1).

Jennifer's kindness has made an impression on those around her. For example, Jennifer's

cousin, notes how "[n]eighbors all turn to her for help. In my memory, she is busy from morning

to night and rarely takes a good rest. She does good to everyone and ask for nothing in return.

Few people could match her." (Ex. 11, Letter Jennifer's Cousin, at 1).

Another of Jennifer's cousins, Yun Qin Lian, notes how

> [Jennifer] is a very warmhearted and accommodating person.
> Everyone who knows her, including her relatives and neighbors,
> praises her. Whenever there are troubles, difficulties or misfortunes
> in a family, she would never turn her back as long as she could
> help. She would try her best to help them. Few people have such a
> broad mind like my cousin.

(Ex. 16, Letter of Yun Qin Lian, at 1).

Yun E. Chen, Jennifer's friend, gives a personal anecdote of a time Jennifer touched him

with kindness:

> What touched me the most was that once I felt physically uncomfortable and a little dizzy, and I planned to go home by subway, however she knew it and felt worried about me, then she drove me to see doctor in Flushing from Bronx. She even paid the toll for me. These are trifles in our daily life, but not everyone could do it.

(Ex 17, Letter of Yun E. Chen, at 1).

Li Hu Zing, Jennifer's friend for 28 years, attests to the fact that Jennifer is and has always been a generous, giving person. In his letter he writes:

> From the time I knew [Jennifer] in 1986 to now, she is a kindhearted and accommodating woman in my mind. She has been working diligently and conscientiously, taking care of her families painstakingly and tirelessly and helping others in need, but she has never asked for anything in return or harmed others to benefit herself.

(Ex. 18, Letter of Li Hui Zhang, at 1).

Another friend of Jennifer's, who has known her for 10 years, writes:

> [Jennifer] is well known for her generosity in our community. She helped many of new immigrants to adapt the new life in the US. Her tiny apartment on the second floor of Happy Garden Chinese Restaurant became famous of our first stop. [Jennifer] always let new comers stay here for months to learn restaurant job skills before we go out to look for job. [Jennifer] would tell us her experiences in US and taught us how to take restaurant orders in English. [Jennifer] never asked for anything in return even she needs to support her two children herself too. Our friends and relatives hold hands and stand together.

(Ex. 19, Letter of Xiaohong Chen, at 1).

### 3. Jennifer Accepts Full Responsibility and is Profoundly Remorseful for Her Criminal Conduct

As Jennifer's letter to this court makes clear, she accepts full responsibility and is profoundly remorseful for her criminal conduct:

My name is Lan Jiang Lu. I arrived in the United States in 1987 to pursue democracy and religious freedom, as well as the dream of living in this righteous nation. I remember in particular that the Christian gatherings were often restricted in my hometown of Fuzhou, therefore I came to the U.S. for the freedom to gather.

Because of my ignorance of the law, I was not aware of my violation of criminal law until the government [officials] came to my home. I have caused a loss to this country, and brought worry to my family; furthermore, I have sinned against God. I am very regretful. I am willing to repent before God and humbly crave His mercy and forgiveness. My elderly mother has been living with us for a long time; because of her diabetes, she needs me to inject her with insulin every night, and because of her cerebella atrophy, she needs me to organize medications for her to take every day. My husband has also suffered from liver disease and diabetes for a long time.

Therefore, I must take on everything to take care of my family members. They all very much need my care. I sincerely beg Your Honor to understand my position, as a wife and daughter, and give me the opportunity to turn over a new leaf. I am willing to do volunteer work. I implore Your Honor to allow me to serve my sentence at home, so that I can take care of my family and it will not fall apart just because of me. I feel very sad and sorry for my husband and my beloved daughter and son. I would be grateful if Your Honor could show mercy to let me be a good daughter again, before God.

(Ex. 21, Letter of Lan Lu Jiang "Jennifer", at 1-2)

Jennifer's remorse is not mere lip service; rather, those who know her best can attest to her sincerity. Specifically, Teresa Jiang, Jennifer's sister, writes:

She found out that she was wrong and the police were looking for her. Sister did not understand and was very scared first but decided to come forward no matter what happens. She turned herself in on…and wanted to find out what went wrong. Now she is ashamed and remorseful.

(Ex. 10, Letter of Teresa Jiang, at 1)

Jennifer's sister-in-law attests to the fact that although cultural and language barriers

played a role and made it difficult to realize the ramifications of her actions, "[Jennifer] has learned a lesson and admitted the mistake after WIC event." (Ex. 20, Letter of Dong Ying Lin, at 2). Her daughter, Scarlett Lu, adds, "Our family are law abiding citizens. Due to language barriers and culture difference, mother did not understand the nature of the business… Mother is sad and remorseful now." (Ex. 8, Letter of Scarlett Lu, at 1.).

> Jennifer's cousin, Yun Qin Lian, pleads to the court:

> > Your Honor, I am worried about her health, and I believe that she is truly repentant..Here, I implore Your Honor to give my cousin a light sentence with an appropriate punishment, so that she has a chance to correct her mistake and turn over a new leaf.

(Ex. 16, Letter of Yun Qin Lian, at 1).


## V.    ANALYSIS

### A. The Law Permits a Below Guideline Sentence

#### 1.    Guidelines Range

Probation's Pre-Sentence Report contains the following Guidelines analysis:

| Category | Points |
|---|---|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(2)) | 6 |
| Loss Amount between $2,500,000 but Less than $7,500,000 (U.S.S.G. § 2B1.1(b)(1)(G)) | +18 |
| Acceptance of Responsibility Adjustment (U.S.S.G. § 3E1.1(a) and (b)) | -3 |
| Total Adjusted Offense Level | 21 |

(PSR ¶¶ 12.)

Jennifer has no prior criminal history, therefore her criminal history level for purposes of the Sentencing Guidelines is a Category I.  (PSR ¶¶ 12)  The advisory Guidelines range associated with an adjusted offense level of 21 for an individual with a criminal history Category I is 37-46 months imprisonment.

### 2.    The Court's Discretion to Vary From the Advisory Guidelines

In *United States v. Booker*, 543 U.S. at 226-46, the Supreme Court held that the then-mandatory Sentencing Guidelines system violated the Sixth Amendment.  As a result, the Court in Booker rendered the Sentencing Guidelines merely "advisory."  *Booker*, 543 U.S. at 245.  Later, the Court further clarified its position, holding that in addition to being advisory, the Guidelines "now serve as one factor among several courts must consider in determining an appropriate sentence."  *Kimbrough v. United States*, 552 U.S. at 90.

To be sure, while a sentencing court must begin the process of determining an appropriate sentence for a criminal defendant by calculating the applicable Guidelines range, it "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party."  *Gall v. United States*, 552 U.S. 38, 49-50 (2007).  Section 3553(a), "as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing."  *Kimbrough*, 552 U.S. at 101 (citing the sentencing goals set forth at 18 U.S.C. § 3553(a)(2)(A)-(D)).

The Supreme Court has since re-emphasized that the Guidelines are both advisory and not to be presumed reasonable.  In *Peugh,* the Supreme Court once again held that the Guidelines are to be given "respectful consideration" but that the district court should "tailor a sentence in light of other statutory concerns as well."  *Peugh,* at 2079-80, (citing *Kimbrough v.*

*United States,* 552 U.S. 85, 1010 (2007)).  Lest anyone conclude that the Court intended to modify *Booker* and its progeny in *Peugh*, the Court specifically states that it is not doing anything of the kind, adding that "[n]othing that we say today undo[es] the holdings of *Booker, Rita, Gall, Kimbrough,* or our other recent sentencing cases." *Peugh* at 2087 (internal quotations omitted).   Accordingly, nothing in *Peugh* alters the existing sentencing regime.  *Nelson v. United States* still stands as it clearly states that a sentencing court may not presume that the applicable Guidelines range is reasonable:

> Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable.  In *Rita* we said as much, in fairly explicit terms: "We repeat that the presumption before us is an *appellate* court presumption. . . . [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."  And in [*Gall*] we reiterated that district judges, in considering how the various statutory sentencing factors apply to an individual defendant, "may not presume that the Guidelines range is reasonable."
>
> . . . . The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.

*Nelson v. United States,* 555 U.S. 350, 352 (2009) (citations omitted).

Section 3553(a) specifically directs that courts "shall impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in paragraph (2) of [§ 3553(a)]."  18 U.S.C. § 3553(a) (emphasis added).  The § 3553(a) factors include the following: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of

sentences available; (4) the advisory guideline range; (5) any pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1)-(7); *see also Booker*, 543 U.S. at 224, 125 S. Ct. at 744.

While a court may impose a Guideline-authorized downward departure in an appropriate case, such downward departure is no longer required in order to justify a below-guidelines sentence. After *Booker*, a sentencing court need not find that a particular § 3553(a) factor is "extraordinary" or sufficient to take a case out of the "heartland" in order to justify a below-guidelines sentence. *See Gall*, 552 U.S. at 47, 128 S. Ct. at 595; *United States v. Rita*, 551 U.S. 338, 351, 127 S. Ct. 2456, 2465 (2007). Even those factors that would not necessarily result in the granting of a downward departure–or that were expressly prohibited or deemed irrelevant by the Sentencing Guidelines–must now be considered under the mandate of § 3553(a). *See United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008) ("[J]ust as we may not bar a district court from considering facts simply because they were also considered by the Commission, the district court 'may not presume' the reasonableness of the Commission's Guidelines sentencing ranges. Rather, in every case, the district court 'must make an individualized assessment' of the appropriate sentence 'based on the facts presented' and the factors detailed in § 3553(a)." (citations omitted)) .

A non-Guidelines sentence is also warranted where a sentencing judge finds that a particular Guideline or Guideline range fails to properly reflect § 3553(a) considerations, reflects "unsound judgment" or when "the case warrants a different sentence regardless." *Rita*, 551 U.S. at 351, 357, 127 S. Ct. at 2465, 2468. The Supreme Court recently clarified this point:

> "Even when a particular defendant . . . presents no special
> mitigating circumstances, such as no outstanding service to

> country or community, no unusually disadvantaged childhood, no
> overstated criminal history score, no post-offense rehabilitation, a
> sentencing court may vary downward from the advisory guideline
> range. . . . The only fact necessary to justify such a variance is the
> sentencing court's disagreement with the guidelines . . . ."

*Spears v. United States*, 555 U.S. 261, 263-64, 129 S. Ct. 840, 842 (2009) (per curiam) (quoting

*United States v. Spears*, 533 F.3d 715, 719 (2008) (Colloton, J., dissenting), *rev'd Spears v.*

*United States*, 555 U.S. at 261-68, 129 S. Ct. at 841-46).


3. **The Factors Set Forth in 18 U.S.C. § 3553 as Applied in this Case Urge a Sentence of Probation and Community Service**

Section 3553(a) allows a sentencing court to consider a defendant in all of his or

her unique humanity.  As Judge Rakoff so eloquently explained:

> [S]urely, if ever a man is to receive credit for the good he has done,
> and his immediate misconduct assessed in the context of his
> overall life hitherto, it should be at the moment of his sentencing,
> when his very future hangs in the balance.  This elementary
> principle of weighing the good with the bad, which is basic to all
> the great religions, moral philosophies, and systems of justice, was
> plainly part of what Congress had in mind when it directed courts
> to consider, as a necessary sentencing factor, "the history and
> characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-514 (S.D.N.Y. 2006); *accord Gall v. United*

*States*, 552 U.S. 38, 52, 128 S. Ct. 586, 598 (2007) ("'It has been uniform and constant in the

federal judicial tradition for the sentencing judge to consider every convicted person as an

individual and every case as a unique study in the human failings that sometimes mitigate,

sometimes magnify, the crime and punishment to ensue.'" (quoting *Koon v. United States*, 518

U.S. 81, 113, 116 S. Ct. 2035, 2053 (1996))); *see also* 18 U.S.C. § 3661; U.S.S.G. § 1B1.4

(sentencing court not limited with respect to the information concerning a defendant's

background, character and conduct that it may consider for the purpose of imposing an appropriate sentence).

A court must balance several factors in fashioning an appropriate sentence, including whether the sentence imposed is enough "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" and "(B) to afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(A)-(B).  These concerns are met in this case with a sentence of probation, which, as noted by the Supreme Court, "substantially restrict[s]" a defendant's freedom:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.  Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.

Gall v. United States, 552 U.S. 38, 48, 128 S. Ct. 586, 595-96 (2007) (citations omitted)); see also United States v. Knights, 534 U.S. 112, 119, 122 S. Ct. 587 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" (quoting Griffin v. Wisconsin, 483 U.S. 868, 874, 107 S. Ct. 3164, 3169 (1987))); Griffin, 483 U.S. at 874, 107 S. Ct. at 3169 ("To a greater or lesser degree, it is always true of probationers (as we have said it to be true of parolees) that they do not enjoy the 'absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.'" (quoting Morrissey v. Brewer, 408 U.S. 471, 480, 92 S. Ct. 2593, 2600 (1972))); United States v. Tolla, 781 F.2d 29, 35 (2d Cir. 1986) ("[P]robation itself contains elements of punishment in the restraints imposed upon the freedom

of the individual . . . ."); <u>United States v. Diambrosio</u>, No. 04-66, 2008 WL 732031, at *5 (E.D. Pa. Mar. 13, 2008) ("A probationary sentence would significantly limit Defendant's liberty and impose restrictions on his activities while allowing him to continue supporting his family and paying his substantial restitution obligation."); <u>cf.</u> <u>United States v. Zimmerman</u>, No. 10-CR-598, 2012 WL 3779387, at *6 (E.D.N.Y. June 19, 2012) ("Imprisonment is not the only way we punish. Supervised release brings with it a series of significant restrictions on a defendant's liberty. . . . Imprisonment is concededly a more onerous form of punishment, and different in kind from supervision, but [the defendant] is being punished.").

## VI. <u>CONCLUSION</u>

A non-Guidelines, non-custodial sentence is an appropriate sentence in this case as to this defendant. We beg the Court to sentence Jennifer to probation with community service dedicated to helping the people of her community, and restitution; it is a sentence that serves the purposes 18 U.S.C §3553(a) and would be a sentence "sufficient, but not greater than necessary," to accomplish the traditional goals of sentencing.

Dated: August **22**, 2014
      New York, New York

              Respectfully,

              *Alex Spiro*

              **Alex Spiro, Esq.**
              **Brafman & Associates, P.C.**
              **767 Third Avenue - 26th Floor**
              **New York, NY 10017**

# ANNEX



**BAKER TILLY**

formerly
HOLTZ RUBENSTEIN REMINICK



August 11, 2014

Alex Spiro, Esq
Brafman and Associates, P.C.
767 Third Avenue, 26th Floor
New York, NY  10017

Re:    Lan J. Lu
       <u>Memorandum of Findings</u>

Dear Mr. Spiro:

<u>Background</u>

The United States Attorney's Office ("USAO") has alleged that during the period March 1, 2011 through November 30, 2013, Lan J. Lu fraudulently exchanged for cash checks issued by the United States Department of Agriculture, Food and Nutrition service ("USDA") under the Women, Infant and Children ("WIC") Program. The government alleges that the business account in the name of Lucky Star Grocery Inc., maintained at the Cathay Bank, was used by Lan J. Lu to facilitate the conversion of WIC checks to cash.

You have asked us to review the financial records of Lan J. Lu  relating to Lucky Star Grocery, Inc. for the period March 1, 2011 through November 30, 2013 ("investigative period") to quantify the financial benefit Lan J. Lu derived from her participation in the scheme.

<u>Observations and Analysis – Lan J. Lu</u>

In evaluating the government's findings, we reviewed the following documents:

1.     Records pertaining to Cathay Bank account ending in 8178 held in the name of Lucky Star Grocery, Inc. and Cathay Bank account ending in 6362 held in the name of Fu Yung Grocery, Inc. to include monthly statements and supporting documentation.

Baker Tilly Virchow Krause, LLP

2. All Invoices, Vendor Receipts and supporting documentation from Lucky Star Grocery and Fu Yung Grocery for the period January 1 2011 through December 31, 2013 including records of Costco, Toys R Us and Babies R Us, BJ's, Jetro, Tuscan Beyer, IG Distribution, Fast Service, Hitmark Republic, Tropicana and Pathmark.

3. Credit card statements for the years 2011 through 2013 for the following credit card accounts: American Express Costco account, Discover account, Slate from Chase Visa account and Capital One MasterCard account.

4. NYS Lottery sales and payments summary from the NYS Lottery for years 2011 through 2013 for Lucky Star Grocery and Fu Yung Grocery.

5. Complaint filed on November 12, 2013 in the United States District Court, Southern District of New York charging Lan J. Lu, and others, with Conspiracy to Commit Theft of Government Funds, in violation of Title 18 United States Code ("U.S.C.") Sections 371 and 641.

## Findings of the various analyses conducted.

We analyzed deposits to the Fu Yung Grocery Inc. ("Fu Yung") Cathay account ending 6362 and the Lucky Star Grocery Inc. ("Lucky Star") Cathay account ending 8178. Total deposits for the years 2011 through 2013 were $ 7,539,756 and $ 2,279,625, respectively, and aggregate $ 9,819,381. We observed the deposited items were inclusive of frequent deposits from the NYS Lottery. These deposits are reimbursements for cash payouts paid by Fu Yung and Lucky Star for Lottery tickets. We also observed that several checks to cash from Fu Yung were deposited to Lucky Star, and vice versa. These inter account transfers amounted to $ 43,300 during the 2011-2013 time frame. Furthermore, we observed Food Stamps deposits and returned checks to be excluded from the WIC deposits. The government alleges that Lan J. Lu is responsible for half of the total WIC deposits which totaled $ 4,398,504 during the investigative period. The table below presents a breakdown of the total deposits made for the years 2011 through 2013 and the calculation process used to determine the total WIC deposits for the investigative period.

| | | | |
|---|---|---|---|
| Deposits | ACC 6362 | $7,539,756 | |
| | ACC 8178 | 2,279,625 | $9,819,381 |
| Less: | Lottery - ACC 6362 | 314,967 | |
| | Lottery - ACC 8178 | 328,612 | |
| | Food Stamps - ACC 6362 | 175,448 | |
| | Food Stamps - ACC 8178 | 126,316 | |
| | Returned Checks - ACC 6362 | 19,951 | |

Baker Tilly Virchow Krause, LLP

|  |  |  |
|---|---|---|
| Returned Checks - ACC 8178 | 13,778 | |
| Interaccount cash transfers | 43,300 | 1,022,372 |
| Total WIC Deposits: | | $8,797,009 |
| Total Lan J. Lu portion of WIC Deposits (50%): | | $4,398,504 |

1. We reviewed all vendor receipts provided by Lan J. Lu and isolated goods purchased that qualified for payment under the WIC Program. We determined that WIC purchases for the years 2011 through 2013 totaled $ 534,284. Presented below are a listing of Vendors, WIC purchases, and forms of payment.

| Vendor | Total amount | Type on Payment | | | | | |
|---|---|---|---|---|---|---|---|
| | | AMEX | DISCOVER | CHASE | CAPITAL ONE | CASH | CHECK |
| Costco | $ 86,780 | $ 86,015 | | | | $ 765 | |
| Toys R Us | 21,848 | | $ 20,628 | | $ 1,220 | | |
| BJ's | 100,383 | 14,492 | 81,705 | $ 4,128 | 11 | 46 | - |
| Jetro | 313,790 | | 313,790 | | | | |
| Tuscan Beyer (from avg) | 5,988 | | | | | | $ 5,988 |
| IG Distribution (from avg) | 1,839 | | | | | | 1,839 |
| Fast Service (from avg) | 2,529 | | | | | | 2,529 |
| Hitmark Republic (from avg) | 519 | | | | | | 519 |
| Tropicana (from avg) | 420 | | | | | | 420 |
| Pathmark (from avg) | 189 | | | | | | 189 |
| Totals | $ 534,284 | $ 100,506 | $ 416,085 | $ 4,128 | $ 1,270 | $ 811 | $ 11,484 |

Note: the Toys R Us receipts did not provide the type of payment, the division above was taken from the credit card statements.

2. We consulted the National Association of Convenience Stores (NACS) table to calculate the industry standards for retail grocery merchandise mark up to estimate the grocery revenue from business operations. The following illustrates the gross revenue from total business operations:

| PORTION OF WIC RELATED PAYOUTS TO VENDORS | | | |
|---|---|---|---|
| WIC PURCHASES | AMOUNT | MARKUP | GROSS REVENUE |
| Costco | $ 86,779.97 | 80% | $ 156,203.94 |
| Toys R Us | 21,847.69 | 80% | 39,325.84 |
| BJ's | 100,382.50 | 80% | 180,688.50 |
| Jetro | 313,790.00 | 80% | 564,822.00 |
| Tuscan Beyer | 5,988.00 | 80% | 10,778.40 |

3

Baker Tilly Virchow Krause, LLP

| | Amount | Markup | Gross Revenue |
|---|---|---|---|
| IG Distribution | 1,839.00 | 80% | 3,310.20 |
| Fast Service | 2,529.00 | 80% | 4,552.20 |
| Hitmark Republic | 519.00 | 80% | 934.20 |
| Tropicana | 420.00 | 80% | 756.00 |
| Pathmark (from avg) | 189.00 | 80% | 340.20 |
| **Grand Total** | $    534,284 | | $    961,711 |

| PAYOUTS TO VENDORS BY CHECK FROM ACC ENDING #8178 | | | |
|---|---|---|---|
| VENDOR | AMOUNT | MARKUP | GROSS REVENUE |
| AMY LI | 7,546.00 | 80% | 13,582.80 |
| Bankok Market | 950.00 | 80% | 1,710.00 |
| Bay Ridge Brewery | 770.24 | 80% | 1,386.43 |
| Brooklyn finest wholesales corp | 516.00 | 80% | 928.80 |
| Carlitos way | 1,493.42 | 80% | 2,688.16 |
| Chen's Ic Cream | 363.00 | 80% | 653.40 |
| Chris Ice Cream | 2,904.00 | 80% | 5,227.20 |
| Coca Cola | 4,833.80 | 80% | 8,700.84 |
| Delta Distribution Corp | 2,475.71 | 80% | 4,456.28 |
| Elmhurst Dairy | 6,359.75 | 80% | 11,447.55 |
| Fast Service | 68,128.02 | 80% | 122,630.44 |
| For the Kids | 5,755.90 | 80% | 10,360.62 |
| Fourth Ave Wholesales | 43,012.78 | 80% | 77,423.00 |
| Hit Mark Republic | 8,694.92 | 80% | 15,650.86 |
| HN EXPERIENCE | 574.36 | 80% | 1,033.85 |
| HUDSON TRADING | 330.00 | 80% | 594.00 |
| Jen's Superstore | 24,757.82 | 80% | 44,564.08 |
| Lady Linda | 5,219.63 | 80% | 9,395.33 |
| Manhattan Beer | 11,762.15 | 80% | 21,171.87 |
| Marina Ice Cream | 1,583.00 | 80% | 2,849.40 |
| Marlow Candy | 108.24 | 80% | 194.83 |
| Pepsi Cola for Kids | 177.20 | 80% | 318.96 |
| shipment distributor | 1,003.55 | 80% | 1,806.39 |
| SUKI LAI WA CHAN | 3,470.00 | 80% | 6,246.00 |
| The Beverage Works NY INC. | 3,045.41 | 80% | 5,481.74 |
| TUSCAN | 228.98 | 80% | 412.16 |
| Union Beer | 19,383.70 | 80% | 34,890.66 |
| VICTORIAS TAVERN | 4,000.00 | 80% | 7,200.00 |
| WHOLESALE OF NY | 504.00 | 80% | 907.20 |
| **Grand Total** | $    229,952 | | $    413,913 |

Baker Tilly Virchow Krause, LLP

| PAYOUTS TO VENDORS BY CHECK FROM ACC ENDING #3362 - FOR 2011 | | | |
|---|---|---|---|
| VENDOR | AMOUNT | MARKUP | GROSS REVENUE |
| ANIY LI | $ 27,795 | 80% | $ 50,030 |
| AZ METRO DISTRIBUTION LLC | 2,626 | 80% | 4,727 |
| BARBII QIAO LING YU | 4,000 | 80% | 7,200 |
| BAY RIDGE BREWERY | 764 | 80% | 1,375 |
| BJ'S WHOLESALE CLUB INC | 98 | 80% | 176 |
| CHANG P LIU | 1,150 | 80% | 2,070 |
| COCA COLA | 5,838 | 80% | 10,508 |
| EAST COAST EGG | 374 | 80% | 674 |
| EHAB DBU-ZAHRIEH | 1,311 | 80% | 2,360 |
| FAST SERVICE WHOLESALE | 94,821 | 80% | 170,679 |
| FOR THE KIDS BEV | 4,803 | 80% | 8,645 |
| FOURTH AVENUE WHOLESALE | 66,748 | 80% | 120,146 |
| GREAT ONE TRADING INC | 408 | 80% | 735 |
| H&N ENTERPRISE | 4,688 | 80% | 8,438 |
| HADSON TRADING CO | 346 | 80% | 622 |
| HITMARK REPUBLIC | 13,853 | 80% | 24,936 |
| IG DISTRIBUTION | 42,912 | 80% | 77,241 |
| JEN'S SUPER STORE | 10,047 | 80% | 18,084 |
| JETRO | 4,716 | 80% | 8,489 |
| KAM CHAN | 1,542 | 80% | 2,776 |
| KEN MABLE | 71 | 80% | 128 |
| KING YUNG LEUNG | 24,820 | 80% | 44,676 |
| LADY LINDA CAKE COMPANY | 6,468 | 80% | 11,642 |
| MANHATTAN BEER DIST | 13,426 | 80% | 24,167 |
| MARINA ICE CREAM CORP | 5,177 | 80% | 9,318 |
| METRO WHOLESALE | 617 | 80% | 1,110 |
| NEW HING YUNG | 19,000 | 80% | 34,200 |
| NEW UTRECHT DIST | 873 | 80% | 1,572 |
| NEW UTRICSTRIBUTOR INC | 624 | 80% | 1,123 |
| PAUL MANDILE | 4,883 | 80% | 8,789 |
| PEPSI COLA BOTTLING | 1,316 | 80% | 2,369 |
| SUKI LAILLA CHAN | 8,971 | 80% | 16,148 |
| SUKI LAIULA CHAN | 4,971 | 80% | 8,948 |
| TROPICANA | 120 | 80% | 215 |
| TUSCAN BEYER | 14,496 | 80% | 26,092 |
| UNION BEER | 4,852 | 80% | 8,734 |
| UNION BEER DIST | 5,698 | 80% | 10,257 |
| YAO WU GUO | 31,150 | 80% | 56,070 |
| Grand Total | $ 436,371 | | $ 785,467 |

Baker Tilly Virchow Krause, LLP

Note: 1) We did not have sufficient information to determine WIC products that were included in the payouts to vendors by check from account ending #6362.

2) The values shown above represent payouts only from 2011, our calculation shows an estimated total amount for the three years based on the deposit ratio (approximately 50%).

| | |
|---|---|
| Confirmed WIC Purchases | $ 961,711 |
| Other Grocery Purchases | $ 1,984,847 |
| Total Purchases | $ 2,946,558 |
| | |
| Total Lan J. Lu portion of Purchases (50%): | $1,473,279 |

3. In accordance with the aforementioned analysis, we determined the WIC revenue for the period January 1, 2011 through December 31, 2013 to be $ 438,784, as shown below:

| | |
|---|---|
| Total Lan J. Lu portion of WIC Deposits: | $ 4,398,504 |
| Less:   Total Lan J. Lu portion of Purchases: | $ 1,473,279 |
| Total Lan J. Lu portion of Deposits less Purchases: | $ 2,925,225 |
| | |
| Revenue portion of cashed WIC checks (15%): | $    438,784 |
| Lan J. Lu portion of cashed WIC checks (3.5%): | $    102,383 |

## Conclusion

During the investigative period, it appears that legitimate WIC sales totaled approximately $1,500,000. The remaining revenue, $2,925,225, allegedly represents WIC receipts that were fraudulently cashed. The government alleges that the commission for cashing WIC checks was approximately 15% of the total check, or $438,784, which would be the maximum benefit received by Lu Jan Lu. The maximum benefit amounts to approximately $146,261 per year for the investigative period, 2011 through 2013.

While the WIC checks were deposited several times per day, 6 days a week, Ms. Lu was only present in the store three days a week, limiting her ability to participate in the fraud scheme.   In fact, the government charges that of $800,000 checks to cash issued by Lucky Star, Lan J. Lu only cashed $28,100 or 3.5% of the total checks cashed.  If that theory is applied to the maximum annual revenue, the portion attributable to Lu would be approximately $34,127 per year.

Baker Tilly Virchow Krause, LLP

The documents relied upon to produce the above tables are available upon request.

Respectfully submitted,

BAKER TILLY VIRCHOW KRAUSE, LLP

Joel R. Podgor, CPA, CFE



*formerly*
HOLTZ RUBENSTEIN REMINICK

Baker Tilly Virchow Krause, LLP
One Penn Plaza, Suite 3000
New York, NY 10119
tel 212 697 6900
fax 212 490 1412
bakertilly.com

July 21, 2014


Alex Spiro, Esq
Brafman and Associates, P.C.
767 Third Avenue, 26th Floor
New York, NY 10017


Re:    Lan J. Lu
       <u>Memorandum of Findings</u>


Dear Mr. Spiro:


<u>Background</u>

On November 12, 2013, a Sealed Complaint was filed in the United States District Court,
Southern District of New York charging Lan J. Lu, and others, with Conspiracy to Commit Theft
of Government Funds, in violation of Title 18 United States Code ("U.S.C.") Sections 371 and
641. The United States Attorney's Office ("USAO") has alleged that during the period March 1,
2011 through November 30, 2013, Lan J. Lu fraudulently exchanged for cash checks issued by
the United States Department of Agriculture, Food and Nutrition service ("USDA") under the
Women, Infant and Children ("WIC") Program. The government alleges that business accounts
in the name of Lucky Star Grocery Inc. and Fu Yung Grocery Inc., maintained at the Cathay
Bank, were used by Lan J. Lu, Danny Lu and others, to facilitate the conversion of WIC checks
to cash.


You have asked us to review the financial records of Lan J. Lu for the period January 1, 2011
through December 31, 2013 ("investigative period") to determine the scope of legitimate WIC
Program participation at the respective stores during the investigative period.


1

An Affirmative Action Equal Opportunity Employer

<u>Observations and Analysis – Lan J. Lu</u>

In evaluating the government's findings, we reviewed the following documents:

1.  Records pertaining to Cathay Bank account ending in 8178 held in the name of Lucky Star Grocery, Inc. and Cathay Bank account ending in 6362 held in the name of Fu Yung Grocery, Inc. to include monthly statements and supporting documentation.

2.  All Invoices, Vendor Receipts and supporting documentation from Lucky Star Grocery and Fu Yung Grocery for the period January 1 2011 through December 31, 2013 including records of Costco, Toys R Us and Babies R Us, BJ's, Jetro, Tuscan Beyer, IG Distribution, Fast Service, Hitmark Republic, Tropicana and Pathmark.

3.  Credit card statements for the years 2011 through 2013 for the following credit card accounts: American Express Costco account, Discover account, Slate from Chase Visa account and Capital One MasterCard account.

4.  NYS Lottery sales and payments summary from the NYS Lottery for years 2011 through 2013 for Lucky Star Grocery and Fu Yung Grocery.

**<u>Findings of the various analysis conducted</u>.**

We analyzed deposits to the Fu Yung Grocery Inc. ("Fu Yung") Cathay account ending 6362 and the Lucky Star Grocery Inc. ("Lucky Star") Cathay account ending 8178. Total deposits for the years 2011 through 2013 were $ 7,539,756 and $ 2,279,625, respectively, and aggregate $ 9,819,381. We observed the deposited items were inclusive of frequent deposits from the NYS Lottery. These deposits are reimbursements for cash payouts paid by Fu Yung and Lucky Star for Lottery tickets. We also observed that several checks to cash from Fu Yung were deposited to Lucky Star, and vice versa. These inter account transfers amounted to $ 43,300 during the 2011-2013 time frame. Furthermore, we observed Food Stamps deposits and returned checks which should be excluded from the WIC deposits for purposes of determining WIC Revenue. The government has charged Lan J. Lu for one half of the total WIC deposits during the investigative period. The government further alleges that Lan J. Lu received commissions for check cashing of 15-20%. The table below presents a breakdown of the total deposits made for the years 2011 through 2013 and the calculation process used to determine the total WIC deposits for the investigative period.

Baker Tilly Virchow Krause, LLP

| Deposits | ACC 6362 | $ 7,539,756 | |
|---|---|---|---|
| | ACC 8178 | 2,279,625 | $ 9,819,381 |
| Less: | Lottery - ACC 6362 | 314,967 | |
| | Lottery - ACC 8178 | 328,612 | |
| | Food Stamps - ACC 6362 | 175,448 | |
| | Food Stamps - ACC 8178 | 126,316 | |
| | Returned Checks - ACC 6362 | 19,951 | |
| | Returned Checks - ACC 8178 | 13,778 | |
| | Interaccount cash transfers | 43,300 | 1,022,372 |
| Total WIC Deposits: | | | $ 8,797,009 |

1. We reviewed all vendor receipts provided by Lan J. Lu and isolated goods purchased that qualified for payment under the WIC Program. We determined that WIC purchases for the years 2011 through 2013 totaled $ 534,284. Presented below are a listing of Vendors, WIC purchases, and forms of payment.

| Vendor | Total amount | Type on Payment | | | | | |
|---|---|---|---|---|---|---|---|
| | | AMEX | DISCOVER | CHASE | CAPITAL ONE | CASH | CHECK |
| Costco | $ 86,780 | $ 86,015 | | | | $ 765 | |
| Toys R Us | 21,848 | | $ 20,628 | | $ 1,220 | | |
| BJ's | 100,383 | 14,492 | 81,705 | $ 4,128 | 11 | 46 | - |
| Jetro | 313,790 | | 313,790 | | | | |
| Tuscan Beyer (from avg) | 5,988 | | | | | | $ 5,988 |
| IG Distribution (from avg) | 1,839 | | | | | | 1,839 |
| Fast Service (from avg) | 2,529 | | | | | | 2,529 |
| Hitmark Republic (from avg) | 519 | | | | | | 519 |
| Tropicana (from avg) | 420 | | | | | | 420 |
| Pathmark (from avg) | 189 | | | | | | 189 |
| Totals | $ 534,284 | $ 100,506 | $ 416,085 | $ 4,128 | $ 1,270 | $ 811 | $ 11,484 |

Note: the Toys R Us receipts did not provide the type of payment, the division above was taken from the credit card statements.

Baker Tilly Virchow Krause, LLP

2. We consulted the National Association of Convenience Stores (NACS) table to calculate the industry standards for retail grocery merchandise mark up to estimate the grocery revenue from business operations. The following illustrates the gross revenue from total business operations:

| CONFIRMED WIC RELATED PAYOUTS TO VENDORS | | | |
|---|---|---|---|
| WIC PURCHASES | AMOUNT | MARKUP | GROSS REVENUE |
| Costco | $ 86,779.97 | 80% | $ 156,203.94 |
| Toys R Us | 21,847.69 | 80% | 39,325.84 |
| BJ's | 100,382.50 | 80% | 180,688.50 |
| Jetro | 313,790.00 | 80% | 564,822.00 |
| Tuscan Beyer | 5,988.00 | 80% | 10,778.40 |
| IG Distribution | 1,839.00 | 80% | 3,310.20 |
| Fast Service | 2,529.00 | 80% | 4,552.20 |
| Hitmark Republic | 519.00 | 80% | 934.20 |
| Tropicana | 420.00 | 80% | 756.00 |
| Pathmark (from avg) | 189.00 | 80% | 340.20 |
| Grand Total | $ 534,284 | | $ 961,711 |

| PAYOUTS TO VENDORS BY CHECK FROM ACC ENDING #8178 | | | |
|---|---|---|---|
| VENDOR | AMOUNT | MARKUP | GROSS REVENUE |
| AMY LI | 7,546.00 | 80% | 13,582.80 |
| Bankok Market | 950.00 | 80% | 1,710.00 |
| Bay Ridge Brewery | 770.24 | 80% | 1,386.43 |
| Brooklyn finest wholesales corp | 516.00 | 80% | 928.80 |
| Carlitos way | 1,493.42 | 80% | 2,688.16 |
| Chen's Ic Cream | 363.00 | 80% | 653.40 |
| Chris Ice Cream | 2,904.00 | 80% | 5,227.20 |
| Coca Cola | 4,833.80 | 80% | 8,700.84 |
| Delta Distribution Corp | 2,475.71 | 80% | 4,456.28 |
| Elmherst Dary | 6,359.75 | 80% | 11,447.55 |
| Fast Service | 68,128.02 | 80% | 122,630.44 |
| For the Kids | 5,755.90 | 80% | 10,360.62 |
| Fourth Ave Wholesales | 43,012.78 | 80% | 77,423.00 |
| Hit Mark Republic | 8,694.92 | 80% | 15,650.86 |
| HN EXPERIENCE | 574.36 | 80% | 1,033.85 |
| HUDSON TRADING | 330.00 | 80% | 594.00 |
| Jen's Superstore | 24,757.82 | 80% | 44,564.08 |
| Lady Linda | 5,219.63 | 80% | 9,395.33 |
| Manhattan Beer | 11,762.15 | 80% | 21,171.87 |

Baker Tilly Virchow Krause, LLP

| Vendor | Amount | Markup | Gross Revenue |
|---|---|---|---|
| Marina Ice Cream | 1,583.00 | 80% | 2,849.40 |
| Marlow Candy | 108.24 | 80% | 194.83 |
| pepsi Cola for Kids | 177.20 | 80% | 318.96 |
| shipment distributor | 1,003.55 | 80% | 1,806.39 |
| SUKI LAI WA CHAN | 3,470.00 | 80% | 6,246.00 |
| The Beverage Works NY INC. | 3,045.41 | 80% | 5,481.74 |
| TUSCAN | 228.98 | 80% | 412.16 |
| Union Beer | 19,383.70 | 80% | 34,890.66 |
| VICTORIAS TAVERN | 4,000.00 | 80% | 7,200.00 |
| WHOLESALE OF NY | 504.00 | 80% | 907.20 |
| **Grand Total** | $ 229,952 | | $ 413,913 |

| PAYOUTS TO VENDORS BY CHECK FROM ACC ENDING #6362 - FOR 2011 | | | |
|---|---|---|---|
| VENDOR | AMOUNT | MARKUP | GROSS REVENUE |
| ANIY LI | $ 27,795 | 80% | $ 50,030 |
| AZ METRO DISTRIBUTION LLC | 2,626 | 80% | 4,727 |
| BARBII QIAO LING YU | 4,000 | 80% | 7,200 |
| BAY RIDGE BREWERY | 764 | 80% | 1,375 |
| BJ'S WHOLESALE CLUB INC | 98 | 80% | 176 |
| CHANG P LIU | 1,150 | 80% | 2,070 |
| COCA COLA | 5,838 | 80% | 10,508 |
| EAST COAST EGG | 374 | 80% | 674 |
| EHAB DBU-ZAHRIEH | 1,311 | 80% | 2,360 |
| FAST SERVICE WHOLESALE | 94,821 | 80% | 170,679 |
| FOR THE KIDS BEV | 4,803 | 80% | 8,645 |
| FOURTH AVENUE WHOLESALE | 66,748 | 80% | 120,146 |
| GREAT ONE TRADING INC | 408 | 80% | 735 |
| H&N ENTERPRISE | 4,688 | 80% | 8,438 |
| HADSON TRADING CO | 346 | 80% | 622 |
| HITMARK REPUBLIC | 13,853 | 80% | 24,936 |
| IG DISTRIBUTION | 42,912 | 80% | 77,241 |
| JEN'S SUPER STORE | 10,047 | 80% | 18,084 |
| JETRO | 4,716 | 80% | 8,489 |
| KAM CHAN | 1,542 | 80% | 2,776 |
| KEN MABLE | 71 | 80% | 128 |
| KING YUNG LEUNG | 24,820 | 80% | 44,676 |
| LADY LINDA CAKE COMPANY | 6,468 | 80% | 11,642 |
| MANHATTAN BEER DIST | 13,426 | 80% | 24,167 |
| MARINA ICE CREAM CORP | 5,177 | 80% | 9,318 |
| METRO WHOLESALE | 617 | 80% | 1,110 |
| NEW HING YUNG | 19,000 | 80% | 34,200 |
| NEW UTRECHT DIST | 873 | 80% | 1,572 |

| | | | |
|---|---:|:---:|---:|
| NEW UTRICSTRIBUTOR INC | 624 | 80% | 1,123 |
| PAUL MANDILE | 4,883 | 80% | 8,789 |
| PEPSI COLA BOTTLING | 1,316 | 80% | 2,369 |
| SUKI LAILLA CHAN | 8,971 | 80% | 16,148 |
| SUKI LAIULA CHAN | 4,971 | 80% | 8,948 |
| TROPICANA | 120 | 80% | 215 |
| TUSCAN BEYER | 14,496 | 80% | 26,092 |
| UNION BEER | 4,852 | 80% | 8,734 |
| UNION BEER DIST | 5,698 | 80% | 10,257 |
| YAO WU GUO | 31,150 | 80% | 56,070 |
| Grand Total | $   436,371 | | $   785,467 |

Note: 1) We did not have sufficient information to determine WIC products that were included in the payouts to vendors by check from account ending #6362.
2) The values shown above represent payouts only from 2011. We used the 2011 deposit ratio to calculate grocery purchases for years 2012 and 2013.

| | |
|---|---:|
| CONFIRMED WIC PURCHASES | $   961,711 |
| OTHER GROCERY PURCHASES | $ 1,984,847 |
| TOTAL PURCHASES | $ 2,946,558 |

3.  In accordance with the aforementioned analysis, we determined the WIC revenue for the period January 1, 2011 through December 31, 2013 to be $ 5,850,451, as shown below:

| | | |
|---|---:|---:|
| Total WIC Deposits: | $ 8,797,009 | |
| Less: Gross Revenue | $ (2,946,558) | |
| Total Deposits less Revenue: | | $ 5,850,451 |
| | | |
| Total Danny Lu portion of Deposits less Purchases (50%): | | $ 2,925,226 |
| Total Lan J. Lu portion of Deposits less Purchases (50%): | | $ 2,925,226 |
| | | |
| Lan J. Lu portion of cashed WIC checks (15%): | | $   438,784 |

The documents relied upon to produce the above tables are available upon request.

Respectfully submitted,

BAKER TILLY VIRCHOW KRAUSE, LLP

*Joel R Podgor*

Joel R. Podgor, CPA, CFE